**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**


**Philip Giroux**

    **v.**                        Civil No. 06-cv-250-PB
                                       Opinion No. 2008 DNH 006

**Town of Danbury, et al.**


**MEMORANDUM AND ORDER**

Philip Giroux brought this civil action pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1985(d) against Danbury Police Chief Dale Cole and Danbury Police Officer Andrew Ware.  Giroux claims that Cook and Ware violated his rights under the First and Fourth Amendments by arresting him without probable cause, failing to hold a prompt probable cause hearing following his arrest, and making the arrest to prevent him from engaging in constitutionally protected speech.  He also asserts supplemental state law causes of action against the same defendants for intentional and negligent infliction of emotional distress. Defendants have moved for summary judgment.  For the reasons stated below, I grant summary judgment with respect to Giroux's false arrest and First Amendment claims, and I give defendants 30

days to supplement their motion to assert a summary judgment

argument regarding Giroux's timely judicial determination of

probable cause issue.  I defer consideration of Giroux's state

law claims pending submission of defendants' supplemental motion.


## I.   <u>BACKGROUND</u>[1]

Giroux is a resident of Danbury, New Hampshire, a town

governed by a Board of Selectmen.  In 1995, the Board of

Selectmen established the Danbury Workshop, Inc., a nonprofit

organization created to manage and operate the Danbury Community

Center ("DCC").  The DCC employs a director, staff, and

volunteers.  Giroux served as the DCC Facilities Manager, but he

resigned from the position on May 13, 2003. (Compl. ¶ 22.)

Despite his resignation, Giroux wished to remain a volunteer at

DCC and to continue participating DCC functions.  <u>Id.</u>

---

[1]   The facts are drawn primarily from defendants' motion for
summary judgment.  As required when reviewing a motion for
summary judgment, I recite the facts in the light most favorable
to Giroux, the non-moving party, and I note which facts are in
genuine dispute.  <u>Latin Am. Music Co. v. Archdiocese of San Juan
of the Roman Catholic & Apostolic Church</u>, 499 F.3d 32, 38 (1st
Cir. 2007).  The facts upon which I base my decision are
undisputed.

**A.   Communications with DCC Board and Staff Members**

Giroux called Terri Towle, the DCC executive director, several times during late May and early June 2003.   Towle recorded Giroux's attempts to contact her and submitted them to the police.   Officer Norman Daigneault of the Danbury Police Department interviewed Towle about the calls and listened to nine voicemail messages from Giroux.   (Aff. of Daigneault ¶ 3, Sept. 4, 2007, Ex. B of Def.'s Mot. for Summ. J.; Aff. of Cook ¶ 3, Sept. 4, 2007, Ex. B of Def.'s Mot. for Summ. J.)   Giroux does not dispute the fact that he made these phone calls, but he does dispute Towle's characterization of the messages as threatening.

On June 4, 2003, Sara Blay, the DCC treasurer, reported a security concern about Giroux to her employer.   (Incident and Crime Report, J.Jill Group, June 4, 2003, Ex. W to Pl.'s Obj. to Mot. for Summ. J.)   Specifically, Blay complained of a "stalking situation with possible violent implications" and reported that Giroux was making threatening phone calls to her house and threatening her husband with physical harm.   Id.   Giroux does not dispute the content of the report or the fact that Blay made the report, although he does dispute the truth of Blay's underlying statement.

-3-

Towle wrote a letter to Giroux on June 11, 2003, thanking him for his service and stating:  "Given all that has happened, we ask that you no longer visit or call the Center, or contact its staff."  (Aff. of Daigneaut ¶ 6; Letter from Towle to Giroux, June 11, 2003, Ex. D. of Def.'s Mot. for Summ. J.)  Officer Daigneault hand-delivered the letter to Giroux on the same day.  (Aff. of Daigneaut ¶ 6.)  Giroux does not dispute these facts, although he argues that the letter's language illegally banned him from the DCC.

On June 19, 2003, Giroux wrote a letter to Towle describing some of his experiences with Towle and the DCC.  (Aff. of Cook ¶ 4; Letter from Giroux to Towle, June 19, 2003, Ex. G of Def.'s Mot. for Summ. J.)  Giroux, Towle and Audrey Pellegrino, the Chairman of the DCC Board, exchanged several letters and phone calls over the course of July and August 2003.  (Aff. of Cook ¶ 4-14.)  Towle and Pellegrino reported Giroux's letters and phone calls to the Danbury Police Department because they found them to be threatening and harassing.  Id.  Giroux claims that his communications were intended only to:  1) clear his name with respect to a rumor allegedly started by Thomas Blay, husband of DCC Treasurer Sara Blay, suggesting that Giroux was a child

-4-

molester, 2) find out when he would be permitted to return to the DCC, and 3) express genuine concern about the safety conditions of the DCC/Town Hall well and a sidewalk on DCC property.

On July 23, 2003, Dale Cook, Chief of Police for the Danbury Police Department, made an officer report regarding the "domestic violence" problem at the DCC.  (Aff. of Cook ¶ 12; Officer Report, Dale Cook, Chief of Police, Danbury Police Department, July 23, 2003, Ex. J of Def.'s Mot. for Summ. J.)  Cook noted in his report that he called Pellegrino to find out why Towle had not yet sought a restraining order against Giroux.  Pellegrino told him that Towle was afraid of Giroux and that Towle wanted all of the DCC members to get restraining orders against Giroux, but that Pellegrino would not personally seek a restraining order.  (Aff. of Cook ¶ 12–13.)  Cook noted in his report:  "At this time, they are handling this themselves against my better judgment."  Id.

**B.    Complaints to the Board of Selectmen**

Giroux attended a meeting of the Danbury Board of Selectmen on August 26, 2003, at which he requested the Selectmen's help in dealing with the DCC Board and also mentioned his concerns about monitoring of the DCC/Town Hall well water.  (Minutes from

Selectmen's Meeting, Aug. 26, 2003, Ex. Q of Pl.'s Obj. to Mot. for Summ. J.)  The Selectmen told Giroux that they would not get involved in Giroux's conflict with the DCC because the running of the DCC was not under the Selectmen's jurisdiction.  Id.  At the meeting, the Selectmen decided to request that the DCC Board attend the next Selectmen's meeting to resolve the conflict.  Id.

Following this meeting, Giroux came to Town Hall and made various complaints to Christie Phelps, the Town Hall's administrative assistant.  (Memos to File, Christie Phelps, Administrative Assistant, Danbury Town Hall, Aug. 27, 2003, Aug. 28, 2003, Ex. K of Def.'s Mot. for Summ. J.)  According to Phelps's file, on August 27, Giroux requested more information about his being banned from the DCC and asserted that he had evidence to show that the Blays were evading property taxes.  Id. On August 28, he provided Phelps with a list of concerns including issues about the DCC/Town Hall well and his communication with various DCC personnel.  Id.; Aff. of Cook ¶ 14.

On August 29, Giroux returned to Town Hall to get copies of records involving the well water and requested that Chief Cook perform a background check to help clear his name regarding the

-6-

molestation rumors.  (Memo to File, Christie Phelps, Aug. 29, 2003, Ex. B of Pl.'s Obj. to Def.'s Supplement to the Record.) Giroux also told Phelps about his conflict with Thomas Blay and mentioned that he was considering retaining a lawyer and making a sign or doing a mass mailing to inform people about how Pellegrino had misled the Selectmen.  Id.

**C.   Events of September 2, 2003**

The Board of Selectmen meeting with the DCC Board was scheduled for September 2, 2003.  Earlier that day, Giroux came to Town Hall twice, once to request an application to carry a concealed weapon and once to drop off the completed application. (Compl. ¶ 80; Memo to File, Christie Phelps, Sept. 2, 2003, Ex. B of Pl.'s Obj. to Def.'s Supp. to the Record.)  Giroux's application for the gun permit mentioned his ongoing personal conflict with Thomas Blay.  (Compl. ¶ 85.)

On the afternoon of September 2, Thomas Blay called the police to report an altercation with Giroux.  (Aff. of Cook ¶ 16; Statement of Thomas Blay, Sept. 2, 2003, Ex. S of Def.'s Mot. for Summ. J.)  Blay stated that he saw a sign on Giroux's truck that said "DCC Treasurer Sara Blay attempted possible tax fraud." (Statement of Thomas Blay, Sept. 2, 2003; Compl. ¶ 85.)  Blay

reported that when he questioned Giroux about the sign, Giroux grabbed him, poked him in the chest, and told Blay that he had gotten a pistol and a permit that day and was going to the Town Hall for the Selectmen's meeting that night "to settle it." (Aff. of Cook ¶ 16; Statement of Thomas Blay, Sept. 2, 2003.) Giroux does not dispute the fact that Blay reported the above statements to the police, although he does dispute the underlying truth of Blay's statements.

Blay called his wife, Sara, to report what had happened. (Statement of Sara Blay, Sept. 9, 2003. Ex. P of Def.'s Mot. for Summ. J.)  Sara Blay, Terri Towle, and Audrey Pellegrino decided to drive to the meeting as a group.  (Statement of Terri Towle, Sept. 4, 2003,  Ex. O of Def.'s Mot. for Summ. J.)  When Pellegrino and Sara Blay picked up Towle at her house, they saw Giroux sitting in his truck, which was parked across the street displaying the sign.  (Statement of Sara Blay, Sept. 9, 2003; Statement of Terri Towle, Sept. 4, 2003.)  Giroux does not dispute these facts.  (Compl. ¶ 126.)

Officer Daigneault received a call that Giroux could be on his way to Town Hall, so he picked up Officer Andrew Ware, also of the Danbury Police Department, and called for back-up of State

Police and other available units.  (Aff. of Daigneault ¶ 10; Aff.
of Ware ¶ 3, Sept. 4, 2007, Ex. Q to Def.'s Mot. for Summ. J.)
Chief Cook received the call and was met at the scene by Chief
Nason of the Bridgewater Police Department.  (Aff. of Cook ¶ 16.)
Nason informed Cook that Giroux had been by Town Hall twice
already, that Thomas Blay had reported being assaulted by Giroux,
and that Giroux had told Blay that he was coming to Town Hall
with a pistol.  Id.  Chief Riley from the Hebron Police
Department confirmed that Giroux had purchased a handgun earlier
that day.  (Aff. of Cook ¶ 18; Aff. of Ware ¶ 4.)

     When Giroux arrived at Town Hall, he was arrested by Chief
Cook.  (Aff. of Cook ¶ 19; Aff. of Daigneault ¶ 13.)  Giroux gave
consent for the officers to search his car for a weapon, and no
weapon was found.  (Aff. of Cook ¶ 19; Officer Report, Dale Cook,
Chief of Police, Danbury Police Department, Sept. 2, 2003, Ex. M
of Def.'s Mot. for Summ. J.)  Giroux was booked at the Bristol
Police Department and was released on $2500 personal recognizance
bail with the conditions that he have no contact with the Blays,
Towle, or their family members, avoid drugs and excessive use of
alcohol, and turn his weapons in to the police department.  (Aff.
of Cook ¶ 19; Orders and Conditions of Bail, Franklin District

Court, Sept. 2, 2003, Ex. N of Def.'s Mot. for Summ. J.)

## D. <u>Subsequent Events</u>

Based on the events of September 2, 2003, and statements from Towle and the Blays, Officer Ware prepared two complaints for stalking and a complaint for simple assault.  (Aff. of Ware ¶ 5; <u>see</u> Criminal Complaints, Sept. 18, 2003, Ex. R of Def.'s Mot. for Summ. J.; Application for Arrest Warrant and Supporting Affidavit, Sept. 18, 2003, Ex. E-1 of Pl.'s Obj. to Mot. for Summ. J.)  The complaint for stalking was dismissed with prejudice by a margin order on October 31, 2003.  (Motion to Dismiss Stalking Complaints for Failing to State an Offense, Oct. 10, 2003, Ex. C-1 of Pl.'s Obj. to Mot. for Summ. J.)  Giroux was convicted on the simple assault charge.  (Aff. of Ware ¶ 7.) There were additional legal proceedings involving Giroux and the defendants in this case; none are relevant here.[2]

---

[2]  Giroux was later charged with harassment for making offensive phone calls to Towle in February 2004.  (Application for Arrest Warrant and Supporting Affidavit, Feb. 27, 2004, Ex. K of Pl.'s Obj. to Mot. for Summ. J.)  These charges were dismissed in September 2004.  (Transcript of Hearing, Franklin District Court, Docket No. 04-CR-475-481, Sept. 17, 2004, Ex. L of Pl.'s Obj. to Mot. for Summ. J.)  Giroux also brought a Right to Know lawsuit in 2005 seeking the minutes from various Board of Selectmen and DCC Board meetings.  (Transcript of Hearing on Right to Know Petitions, Merrimack Superior Court, Case No. 05-E-

## II.   **STANDARD OF REVIEW**

Summary judgment is appropriate when "the pleadings,
depositions, answers to interrogatories, and admissions on file,
together with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the moving party
is entitled to a judgment as a matter of law."  Fed. R. Civ. P.
56(c).  A party seeking summary judgment must first identify the
absence of a genuine issue of material fact.  Celotex Corp. v.
Catrett, 477 U.S. 317, 323 (1986).  The burden then shifts to the
nonmoving party to "produce evidence on which a reasonable finder
of fact, under the appropriate proof burden, could base a verdict
for it; if that party cannot produce such evidence, the motion
must be granted."  Ayala-Gerena v. Bristol Myers-Squibb Co., 95
F.3d 86, 94 (1st Cir. 1996); see Celotex, 477 U.S. at 323.

## III.   **ANALYSIS**

Giroux alleges that his arrest on September 2, 2003,
violated his Fourth Amendment right to be free from unreasonable
searches and seizures because:  (1) Chief Cook, the arresting

146, Case No. 05-E-14, Apr. 25, 2005, Ex. Y of Pl.'s Obj. to Mot.
for Summ. J.)

officer, did not have probable cause to arrest him, and (2)
Officer Ware, the officer who prepared the complaints against
Giroux, failed to provide Giroux with a timely judicial
determination of probable cause following his arrest.  Giroux
alleges that Chief Cook violated Giroux's First Amendment rights
because he arrested Giroux as a pretext to stop Giroux from
displaying the sign on his truck, which contained protected
speech about a public figure.  Finally, Giroux alleges that both
officers committed the torts of intentional and negligent
infliction of emotional distress when they arrested him without
probable cause, failed to provide him with a timely judicial
determination of probable cause, and imposed excessive bail
conditions.  I address each of Giroux's claims in turn.

## A.   **Fourth Amendment:  False Arrest**

Giroux argues that he was falsely arrested because Chief
Cook lacked probable cause to arrest him.  Cook contends that
there was adequate probable cause or, in the alternative, that he
is entitled to qualified immunity.  When government officials
assert the affirmative defense of qualified immunity, I begin by
examining whether the facts as alleged demonstrate a
constitutional violation.  Jennings v. Jones, 499 F.3d 2, 11 (1st

Cir. 2007).  If I determine that there was no constitutional violation, I need not proceed further because plaintiff's claim fails as a matter of law.  Id.; Cox v. Hainey, 391 F.3d 25, 30 (1st Cir. 2004).

The Fourth Amendment guarantees the right of persons to be free from unreasonable searches and seizures.  U.S. Const. Amend. IV.  A warrantless arrest is reasonable under the Fourth Amendment "where there is probable cause to believe that a criminal offense has been or is being committed."  Devenpeck v. Alford, 543 U.S. 146, 152 (2004); Beck v. Ohio, 379 U.S. 89, 91 (1964); Logue v. Dore, 103 F.3d 1040, 1044 (1st Cir. 1997).

Probable cause for an arrest exists "when the arresting officer, acting upon apparently trustworthy information, reasonably concludes that a crime has been (or is about to be) committed and that the putative arrestee likely is one of the perpetrators."  Acosta v. Ames Dep't Stores, Inc., 386 F.3d 5, 9 (1st Cir. 2004); see Cox, 391 F.3d at 31; Roche v. John Hancock Mut. Life Ins. Co., 81 F.3d 249, 254 (1st Cir. 1996).  The inquiry is objective, not subjective, asking whether there was a reasonable likelihood that the arrestee committed the alleged crime.  See, e.g., Cox, 391 F.3d at 31; Roche, 81 F.3d at 254.

-13-

To determine whether probable cause existed for Giroux's arrest, I must first consider what Chief Cook knew at the time of the arrest.  See Beck, 379 U.S. at 91 (defining the inquiry as: "whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense.").  I note that it is the collective knowledge of the officers involved, not the individual knowledge of the arresting officer, that is the subject of the probable cause inquiry.  See United States v. Pardue, 385 F.3d 101, 106 (1st Cir. 2004). Giroux's arrest is valid if the collective knowledge of all the officers involved establishes probable cause for his arrest.  Id.

Chief Cook and other officers present at the time of Giroux's arrest were aware of the ongoing conflicts and communications between Giroux and various DCC board members and staff during the summer of 2003.[3]  Officer Daigneault and Chief Cook knew that Towle had been receiving unwanted telephone calls

_____

[3]  Giroux does not dispute any of the officers' assertions regarding what the officers knew at the time of his arrest and what had been reported to police, although he disputes some of the underlying allegations made in the reports.

from Giroux beginning in June 2003.  (Aff. of Cook ¶ 4-14; Aff.
of Daigneault ¶ 12; Police Report, June 4, 2003, Ex. C of Def.'s
Mot for Summ. J.)  Both Cook and Daigneault also knew that, on
June 10, 2003, Towle had requested that a police officer deliver
a letter to Giroux asking him to stay away from the DCC and avoid
contacting the staff.  (Aff. of Daigneault ¶ 5-6; Aff. of Cook ¶
9; Police Report, June 10, 2003, Ex. C of Def.'s Mot for Summ. J.
at 7.)  Cook knew that Giroux had a personal conflict with Sara
Blay, and Daigneault indicated this fact in a police report.
(Aff. of Cook ¶ 10; Police Report, June 4, 2003, Ex. C of Def.'s
Mot for Summ. J. at 4, 5.)  On July 23, 2003, Chief Cook noted in
his report that there was a domestic violence problem at the DCC,
that Towle was scared of Giroux, that he had advised Towle to get
a restraining order on Giroux, and that the DCC staff members
were "handling this themselves against my better judgment."
(Aff. of Cook ¶ 12-13; Officer Report, Dale Cook, Chief of
Police, Danbury Police Department, July 23, 2003, Ex. J of Def.'s
Mot for Summ. J. at 2.)

     Cook also had knowledge about Giroux's activities on
September 2, 2003, prior to his arrest.  Based on communications
from Chief Nason of the Bridgewater Police Department, Cook knew

that Thomas Blay had reported being assaulted by Giroux earlier
in the day.  (Aff. of Cook ¶ 16; Aff. of Ware ¶ 3.)  Cook knew
that Blay had reported that Giroux said that he had purchased a
handgun and that he was going to the Selectmen's meeting that
night.  (Aff. of Cook ¶ 16; Aff. of Daigneault ¶ 9; Officer
Report, Norman Daigneault, Danbury Police Department, Sept. 3,
2003, Ex. L of Def.'s Mot for Summ. J.)  Prior to the arrest,
Officer Riley from the Hebron Police Department confirmed this
handgun purchase to Cook.  (Aff. of Cook ¶ 18; Aff. of Ware ¶ 4.)
Finally, Cook knew that Towle and Sara Blay would be at the
Selectman's meeting that evening.  (Aff. of Cook ¶ 17.)

     The offenses of stalking and simple assault are defined by
New Hampshire statutory law.  The offense of simple assault is
defined in N.H. Rev. Stat. Ann. § 631:2–a, which states that a
person is guilty of simple assault if he purposely or knowingly
causes unprivileged physical contact to another.  The offense of
stalking is defined in N.H. Rev. Stat. Ann. § 633:3, which
provides that a person commits the offense of stalking if he
"purposely, knowingly, or recklessly engages in a course of
conduct targeted at a specific person which would cause a
reasonable person to fear for his or her personal safety or the

-16-

safety of a member of that person's immediate family, and the person is actually placed in such fear."  N.H. Rev. Stat. Ann. § 633:3 I(a).  A "course of conduct" is defined as two or more acts evidencing a continuity of purpose, and the statute indicates that phone calls and letters are acts that can establish a course of conduct. N.H. Rev. Stat. Ann. § 633:3 II(a)(7); see also N.H. Rev. Stat. § 644:4 II.

There is significant evidence in the record to support Chief Cook's reasonable belief that Giroux had committed the misdemeanor crimes of both simple assault and stalking.  Cook knew that Thomas Blay had reported being assaulted by Giroux prior to Giroux's arrest, and:  "The uncorroborated testimony of a victim or other percipient witness, standing alone, ordinarily can support a finding of probable cause."  Acosta, 386 F.3d at 10.  Blay's credibility was bolstered by the fact that, prior to Giroux's arrest, officers were able to confirm Blay's report that Giroux had purchased a weapon earlier in the day.  Cook also had probable cause to believe that Giroux had committed the crime of stalking because he knew that Giroux had engaged in many acts of unwanted and intimidating communication including phone calls,

letters, and in-person confrontations with Towle and other DCC personnel despite having been notified that they did not desire further communication.

The fact that the officers purported to be arresting Giroux only for stalking, not simple assault, does not make the arrest illegal.  See Devenpeck, 543 U.S. at 153 (holding that the "subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause."); United States v. Jones, 432 F.3d 34, 41 (1st Cir. 2005) (confirming that "the probable cause inquiry is not necessarily based upon the offense actually invoked by the arresting officer but upon whether the facts known at the time of the arrest objectively provided probable cause to arrest.")  The objective facts demonstrate that the officers had probable cause to arrest Giroux for simple assault.  The fact that he was booked on the stalking charges alone is irrelevant.  See Jones, 432 F.3d at 41.

Under New Hampshire statutory law, a police officer may arrest a person without a warrant on a charge of a misdemeanor or a violation in a number of situations including when:

(c) He has probable cause to believe that the person to be arrested has committed a misdemeanor or violation, and, if

-18-

not immediately arrested, such person will not be
apprehended, will destroy or conceal evidence of the
offense, or will cause further personal injury or damage to
property.

N.H. Rev. Stat. Ann. § 594:10(c).

In this case, Cook arrested Giroux when he arrived at the
Town Hall because he had good reason to believe that Giroux had
threatened Thomas Blay that he would be coming to the meeting
with a gun "and was going to settle it." (Aff. of Cook ¶ 16.)
Based on their understanding of what Giroux had said to Thomas
Blay earlier, the officers had probable cause to believe that if
Giroux was not immediately arrested, he would cause further
personal injury to Towle, Sara Blay, or other DCC personnel who
were present at the meeting.  See N.H. Rev. Stat. Ann. §
594:10(c).

In summary, I find that the facts and circumstances
described above were adequate to support the belief of a
reasonable police officer, standing in the shoes of Chief Cook,
that Giroux had committed a crime.  Giroux has failed to allege
any evidence to suggest that the arrest was carried out in an
unreasonable manner.  Because Giroux has failed to state adequate
grounds to establish that his arrest violated the Fourth

-19-

Amendment, his false arrest claim fails as a matter of law.  I need not address the other qualified immunity prongs.

**B.    Fourth Amendment:  Timely Judicial Determination of Probable Cause**

Giroux also argues that Officer Ware violated his Fourth Amendment rights by failing to facilitate a timely judicial determination of probable cause following Giroux's warrantless arrest.  In support of his claim, Giroux cites the New Hampshire Attorney General's Law Enforcement Manual, which states that a person who is arrested must be brought before the court within 24 hours of the arrest.  (N.H. Att'y Gen.'s Law Enforcement Manual, Ex. J of Pl.'s Obj. to Mot. for Summ. J. at 61.)  The Manual also requires that an arresting officer prepare a "Gerstein" affidavit if the person was arrested without a warrant.  Id.  Under Gerstein v. Pugh, 420 U.S. 103 (1975), a person suspected of a crime whose liberty is restrained for more than the brief period of detention necessary to administratively process the arrest must be afforded a judicial determination of probable cause in a timely manner.  A Gerstein affidavit is a sworn statement filed by the arresting officer to provide a proper basis for a judicial determination of probable cause.  In re Holloway, 995 F.2d 1080,

1083 (D.C. Cir. 1993).

Chief Cook and Officer Ware fail to provide any facts or legal authority to demonstrate why they are entitled to summary judgment on this claim.  Without additional facts regarding what happened during the time Giroux was in police custody and during the bail proceedings, I am unable to conclude that Giroux's claim lacks merit and I cannot grant summary judgment on this claim. If defendants wish to seek summary judgment on this claim, they may submit a supplement to their motion within 30 days, describing the undisputed facts and legal authority that would support summary judgment.

## C.  <u>First Amendment Claim</u>

Giroux brings a First Amendment claim, arguing that the sign on his truck that stated "DCC Treasurer Sara Blay Attempted Possible Tax Fraud" was a "motivating and substantial factor" in his arrest.  (Compl. ¶ 107.)  Specifically, Giroux alleges that Chief Cook interfered with Giroux's First Amendment right when he arrested Giroux with the intent to punish him and discourage him from exercising his rights.  (Compl. ¶ 114.)  The only evidence that Giroux provides to substantiate this claim is the fact that, at the time of his arrest, his truck had a large sign containing

protected speech.  Giroux has presented no evidence, however, to substantiate his claim that Cook arrested him for an inappropriate or discriminatory reason or as a pretext to stop Giroux from publicizing his message.  Because I find that there was adequate probable cause for Giroux's arrest independent of any consideration about the sign, Giroux's First Amendment claim also fails as a matter of law.

**D.   State Law Claims**

Giroux also brings state law claims for intentional and negligent infliction of emotional distress; defendants have moved for summary judgment on both claims.  Because the basis of federal jurisdiction over these claims is solely grounded in supplemental jurisdiction, I will defer ruling on these claims until defendants provide a supplement to their motion for summary judgment regarding Giroux's timely judicial determination of probable cause claim.

**IV.   CONCLUSION**

For reasons stated above, defendants' motion for summary judgment (Doc. No. 37) is granted in part and defendants are

given 30 days to file a supplement to their motion for summary
judgment on the remaining claim.   The clerk is ordered to enter
judgment accordingly.

     SO ORDERED.


                           /s/Paul Barbadoro
                           Paul Barbadoro
                           United States District Judge

January 15, 2008

cc:  Daniel J. Mullen, Esq.
     Philip Giroux, pro se